FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2016 JUN 29  A 8: 58

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| RANJITH KEERIKKATTIL | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:16-CU-827 |
| STACY SAWIN, ANDREW SAWIN, | ) | (CMH/MSN) |
| DELOITTE LLP, DELOITTE | ) | |
| CONSULTING LLP, DELOITTE | ) | **JURY TRIAL DEMAND** |
| SERVICES LP, ALICIA CARBERRY, | ) | |
| DERICK MASENGALE, MIKE | ) | |
| PRESTON, PAMELA SEATS, | ) | |
| ERIC JANSON | ) | |
| Defendants. | ) | |

## COMPLAINT

COMES NOW Plaintiff, RANJITH KEERIKKATTIL, respectfully alleges, states and prays:

### INTRODUCTION

1. This lawsuit centers on unlawful acts committed by Defendants' based on false, misleading and/or defamatory statements made by Defendant Stacy Sawin about Plaintiff Ranjith Keerikkattil ("Mr. Keerikkattil") that resulted in grave and irreparable damage to him. These unlawful acts committed by Defendants with malice, resulted in unlawful termination of Mr. Keerikkattil's employment with Deloitte Consulting LLP and jeopardized his career with the firm. In addition, Mr. Keerikkattil has suffered significant embarrassment, humiliation, mental suffering, and emotional distress as a result of Defendants' unlawful actions.

2. Until he was unlawfully terminated, Mr. Keerikkattil was a high performing

Senior Consultant on the Partner/Principal/Director (PPD) Track with Deloitte Consulting LLP. He was one of the youngest Senior Consultants at age 26 with target promotion date to Manager in 2017. At that career trajectory, he would have been promoted to a Partner well before the age of 40 with a career of over 20 years as a Partner[1] with the firm.

## PARTIES

3. Plaintiff RANJITH KEERIKKATTIL is a resident of Maryland residing at 4707 Grand Bend Drive, Catonsville, MD, 21228.

4. Defendant STACY KIMIE SAWIN is a resident of District of Columbia residing at 130 M Street NE, Washington, DC, 20002. Ms. Sawin was also at times relevant, a resident of Oregon with her permanent address at 4780 Lower Drive, Lake Oswego, OR, 97035.

5. Defendant ANDREW JOHNSON SAWIN is a resident of Oregon residing at 4780 Lower Drive, Lake Oswego, OR, 97035.

6. Defendant DELOITTE LLP ("Deloitte") is a validly existing limited liability partnership organized under the laws of the State of Delaware, is authorized to do business within the Commonwealth of Virginia and maintains an office at 1919 N. Lynn Street, Arlington, VA, 22209.

7. Defendant DELOITTE CONSULTING LLP ("Deloitte Consulting"), a subsidiary of Deloitte LLP, is a validly existing limited liability partnership organized under the laws of the State of Delaware, is authorized to do business within the

---

[1] Partners/Principals at Deloitte retire at age 62.

2

Commonwealth of Virginia and maintains an office at 1919 N. Lynn Street, Arlington, VA, 22209.

8. Defendant DELOITTE SERVICES LP ("Deloitte Services"), a subsidiary of Deloitte LLP, is authorized to do business within the Commonwealth of Virginia and maintains an office at 1919 N. Lynn Street, Arlington, VA, 22209. Deloitte Talent is a part of Deloitte Services.

9. Defendant ALICIA CARBERRY is a Senior Manager with Deloitte Services LP based out of its Rosslyn office at 1919 N. Lynn Street, Arlington, VA, 22209.

10. Defendant DERICK MASENGALE is a Director with Deloitte Consulting LLP based out of its Rosslyn office at 1919 N. Lynn Street, Arlington, VA, 22209.

11. Defendant MIKE PRESTON is the Chief Talent Officer of Deloitte LLP based out of its Dallas office at 2200 Rose Avenue, Dallas, TX, 75201.

12. Defendant PAMELA WILCOX SEATS a Senior Manager with Deloitte Services LP based out of its Hermitage office at 4022 Sells Drive, Hermitage, TN, 37076.

13. Defendant ERIC J. JANSON is a resident of Virginia residing at 12712 Turberville Ct, Herndon, VA, 20171. He is an attorney with Seyfarth Shaw LLP and maintains his principal place of business at 975 F Street, NW, Washington, DC, 20004.

## JURISDICTION AND VENUE

14. The U.S. District Court for the Eastern District of Virginia has jurisdiction over the matter under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and 28 U.S.C. § 1343 among other statutes.

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.§ 1331 and 28 U.S.C. § 1367 because this action arises under the laws of the United States.

16. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391 because (i) Plaintiff was employed in Arlington County, Virginia, (ii) Deloitte, Deloitte Consulting and Deloitte Services do business in Arlington County, Virginia, (iii) the individual Defendants engaged in misconduct the effects of which occurred in this district, and (iv) the events giving rise to Plaintiff's claims occurred in this district.

17. In regards to claims of state law violations, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367. Those claims derive from a common nucleus of operative fact and arise from the same facts, transactions and occurrences as Plaintiff's allegations in support of his claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. 28 U.S.C. § 1367(a)

## FACTUAL ALLEGATIONS

18. Plaintiff re-alleges and incorporates herein by reference the above paragraphs, inclusive, as though fully set forth herein.

### Ranjith Keerikkattil's Employment with Deloitte Consulting LLP

19. Ranjith Keerikkattil commenced his employment with Deloitte Consulting LLP on November 10, 2014. He was hired as a Senior Consultant within its Federal Information Management Service Line headed by Defendant Derick Masengale.

20. In accordance with the employment contract signed between Mr. Keerikkattil and Deloitte Consultant LLP, he would be paid an annual salary of $115,000. Besides he

would be eligible for up to 18.75% ($21,563) of his annual salary as bonus for FY 2014. The employment contract is attached as Exhibit A.

21. At 26, Mr. Keerikkattil was one of the youngest Senior Consultants within Deloitte's Federal Consulting practice.

22. Mr. Keerikkattil would have had over 35 years of service with Deloitte Consulting until the age of 62, the retirement age for Principals[2] at the firm.

23. He was on the Partner/Principal/Director track within Deloitte Consulting LLP and at his current trajectory would easily have become a Principal before the age of forty.

### Ranjith Keerikkattil's Performance Evaluation Prior to His Unlawful Termination

24. All Deloitte Consulting employees are assigned a Counselor as part of the firm's performance evaluation process.

25. Deloitte Consulting assigned Mehran Tamami ("Mr. Tamami"), a Manger within its Federal Information Management Service Line as Mr. Keerikkattil's Counselor.

26. Deloitte Consulting utilizes an internet based application named Deloitte Performance Management Employee ("DPME") for its performance evaluation process.

27. Under DPME, an overall rating of "2" meant that the individual's results had exceeded agreed goals, performance and contribution expectations.

28. Under DPME, an overall rating of "3" meant that the individual's results had achieved goals, performance, and contribution expectations.

29. Under DPME, an overall rating of "4" meant that the individual's results had mixed, but have achieved some agreed goals, performance, and contribution expectations and further development was necessary.

---

[2] Within Deloitte Consulting, Partners have the title of Principal.

30. Under DPME, an overall rating of "5" meant that the individual's results did not achieve a majority of agreed goals, performance and contribution expectations.

31. For Performance Year (PY) 2014, Mr. Tamami informed Mr. Keerikkattil that he was given a "high 3" rating. Mr. Tamami's communication regarding this is attached as Exhibit B. Besides, Mr. Keerikkattil was also assigned a target promotion date to a Manager in 2017.

32. A "high 3" in DPME terms refers to a numerical value close to 2 which means that Mr. Keerikkattil had exceeded agreed goals, performance and contribution expectations.

33. Mr. Keerikkattil's DPME rating would have made him eligible for a year-end bonus for PY 2014 of up to $21,563.

34. DPME ratings are based on Project Evaluation ("PE") ratings. PE ratings have values between "2" and "5" with "2" being the highest and "5" the lowest similar to DPME ratings.

35. Mr. Keerikkattil had three PE's for PY 2014 of which two had a "2" rating and one had a "3" rating.

36. Therefore, it is clear from the record that Mr. Keerikkattil not only met his performance goals but also exceeded it.

*Ranjith Keerikkattil's Acquaintanceship with Stacy Sawin*

37. Stacy Sawin ("Ms. Sawin") commenced her employment with Deloitte Consulting in February 2015 as a Business Technology Analyst within its Federal Information Management Service Line headed by Defendant Derick Masengale.

38. Mr. Keerikkattil met Ms. Sawin for the first time on March 4, 2015 at

Information Management Sip'n'Share, a networking event held at Deloitte. *See* Exhibit C.

39. On or around April 14, 2015, Ms. Sawin gets fired from her project with Bureau of Engraving & Printing ("BEP") allegedly due to drug related misconduct. On April 14, 2015, Ms. Sawin contacts Mr. Keerikkattil requesting help in finding a project or with other opportunities at Deloitte. *See* Exhibit D. Respondent initially informs Ms. Sawin that he does not have any opportunity for her and provided her with a couple of contacts at Deloitte to help her.

40. FPS Pursuit Leadership was looking for BA/BTA to assist with Centers for Medicare and Medicaid ("CMS") Fraud Prevention System ("FPS") Pre-RFP (Request For Proposal) effort. Mr. Keerikkattil reached out to Ms. Sawin inquiring about her availability and whether she was interested in contributing to the FPS proposal effort. She answered in the affirmative.

41. Mr. Keerikkattil forwarded her name to Ritesh Verma, a Director with Deloitte Consulting, who eventually made the decision to include Ms. Sawin on the FPS proposal effort. The e-mail communication between Mr. Keerikkattil, Ms. Sawin and Mr. Verma is attached as Exhibit E.

*Ranjith Keerikkattil's Cease and Decist Letter to Stacy Sawin*

42. On or around May 30, 2015, Mr. Keerikkattil receives a series of communications from the Ms. Sawin that hinted that the he was interested in a romantic relationship with her. Out of an abundance of caution, Mr. Keerikkattil sent Ms. Sawin an e-mail titled "FPS Future Guidance and Cease & Desist Letter". A copy of the e-mail letter is attached as Exhibit F.

*Stacy Sawin's Violations of Deloitte's Code of Ethics & Professional Conduct*

43. Stacy Sawin herself had committed multiple violations of Deloitte's Code of Ethics & Professional Conduct.

44. Stacy Sawin failed to honestly and truthfully disclose to FPS Pursuit Leadership that she was terminated from her United States Bureau of Engraving & Printing (BEP) engagement because of drug related misconduct. This constitutes a violation of "Honesty and Trust" under Deloitte's Code of Ethics & Professional Conduct.

45. Ms. Sawin maintained romantic and/or sexual relationship with her colleagues at Deloitte most notably with Vikaram Rajan., in violation of "Personal Relationships" under Deloitte's Code of Ethics & Professional Conduct. Ms. Sawin herself acknowledges this in a social media posting. *See* Exhibit G.

46. Ms. Sawin extensively used Deloitte corporate assets to exchange thousands of texts, IMs, pictures and Snapchat messages with Mr. Rajan, some of which were sexually explicit. These communications were completely irrelevant to Deloitte's legitimate business needs and constitute violations of Deloitte's "Communications Systems" and "Use of Deloitte Assets" under Deloitte's Code of Ethics & Professional Conduct. To make these violations even more egregious, Ms. Sawin used dating apps such as "Okcupid" on her Deloitte corporate phone to solicit companionship.

*Stacy Sawin's Campaign to Malign Ranjith Keerikkattil*

47. After receiving the FPS Future Guidance and Cease & Desist Letter Mr. Keerikkattil, Ms. Sawin engages in a campaign to malign his reputation and destroy his career at Deloitte. She considered Mr. Keerikkattil a threat to her career at Deloitte since

8

he was aware of her multiple violations of Deloitte's Code of Ethics & Professional Conduct.

48. Ms. Sawin also enlists her father Andrew Johnson Sawin to dig up dirt on Mr. Keerikkattil. Andrew Sawin conducts extensive search of Mr. Keerikkattil on the internet. He also visits Mr. Keerikkattil's LinkedIn profile.

49. The tortious acts that Ms. Sawin subsequently commits, including the false, misleading and/or defamatory statements that she made to Deloitte leadership and colleagues, would end Mr. Keerikkattil's career at Deloitte and bring irreparable damage to his personal and professional reputation.

*Ranjith Keerikkattil's Unlawful Termination from Deloitte Masterminded by Alicia Carberry*

50. On June 10, 2015, Alicia Carberry ("Ms. Carberry") sent Mr. Keerikkattil a calendar invite for a meeting later that day.

51. In accordance with the calendar invite, Mr. Keerikkattil met with Ms. Carberry at around 3 PM that day.

52. Ms. Carberry informed Mr. Keerikkattil that he would be placed on administrative leave and that she would be confiscating his Deloitte corporate laptop.

53. Ms. Carberry's demeanor and statements made him concerned. He was quite sure that Ms. Carberry had already made up her mind and the she planned to terminate him.

54. Mr. Keerikkattil started saving his Deloitte e-mails that he considered being relevant for a Title VII action. Unfortunately, he was unable to save all relevant e-mails.

55. At the same time, Ms. Carberry started asking Mr. Keerikkattil a bunch of

questions in rapid-fire mode to which he answered none. Mr. Keerikkattil instead stated that he would send her written response to all her questions in the next couple of days. He also noted down the questions.

56. The following day, Mr. Keerikkattil sent a Notice titled "Litigation Hold re Documents and Electronic Data" to Leah Lipskar, Associate General Counsel at Deloitte and copied Ms. Carberry. A copy of the Notice is attached as Exhibit H. The Notice directs Deloitte to preserve responsive documents for impending litigation.

57. On June 14, 2015, Mr. Keerikkattil wrote an e-mail to Ms. Carberry titled "Allegations Against Stacy Sawin" requesting her to investigate Ms. Sawin's violations of Deloitte's Code of Ethics & Professional Conduct. A copy of the e-mail is attached as Exhibit I.

58. Mr. Keerikkattil also wrote an e-mail to Ms. Carberry titled "Meeting Regarding Future Steps and Status of Investigations". In the e-mail, Mr. Keerikkattil requested a formal hearing on Monday, June 22, 2015. He also inquired about the possibility of a transfer within Deloitte Consulting to its Strategy & Operations. . A copy of the e-mail is attached as Exhibit J.

59. The formal hearing never happened. Instead, Alicia Carberry scheduled a "Termination Call" on June 19, 2015.

60. On the call Ms. Carberry started with reading the "Separation Memorandum" from start to end. The Separation Memorandum is attached as Exhibit K. Though the memo states that it was written by Derick Masengale ("Mr. Masengale"), it was actually written and sent by Ms. Carberry. A copy of the e-mail from Ms. Carberry is attached as Exhibit L. Another evidence for this is the error she made in the memo where she states

10

that Mr. Masengale is a Principal with Deloitte Consulting, when in fact he is only a Director.

61. After Ms. Carberry's recitation of the "Separation Memorandum", Mr. Keerikkattil repeatedly asked her what the reason for his termination was. Ms. Carberry responded back in an angry tone stating that Mr. Keerikkattil was terminated because he raised allegations against Stacy Sawin and thereby interfered in her investigation.

62. Mr. Keerikkattil then informed her that her actions constitute First Amendment Retaliation.

63. At this time, Mr. Masengale, who was also on the call, intervened and told Mr. Keerikkattil that he would need to talk to Deloitte's Office of General Counsel regarding this.

*Alicia Carberry's Violations of Deloitte's Code of Ethics & Professional Conduct*

64. For days, Mr. Keerikkattil was disturbed by Ms. Carberry's statement that was terminated because of allegations raised against Stacy Sawin and wanted to know why Ms. Carberry was specifically unhappy about those allegations. So he decided to investigate Ms. Carberry's past.

65. Alicia Carberry Ham was married to Ernest Loren Ham of 609 Waterwheel Lane, Millersville, MD, 21108, until their married ended in a divorce on August 28, 2007. Alicia Carberry Ham also assumed the name of Alicia Ann Carberry on August 28, 2007.

66. After her marriage collapsed, Ms. Carberry sought out companionship, romance and/or sex at Deloitte, her workplace.

67. As a result of her utilization of Deloitte assets including corporate address

book, e-mail account, mobile phone and instant messenger, Ms. Carberry met Joseph Kelly Mire, a Principal with Deloitte, who joined the firm as part of its Bearing Point acquisition.

68. When the romantic and sexual relationship between them blossomed, Ms. Carberry was a Manager (and subsequently Senior Manager) and Mr. Mire was a Principal with Deloitte.

69. At all relevant times, Mr. Mire was a Senior Practioner to Ms. Carberry at Deloitte.

70. By having an intense romantic and sexual relationship at their workplace, both Ms. Carberry and Mr. Mire violated "Personal Relationships" under Deloitte's Code of Ethics & Professional Conduct.

71. Ms. Carberry, by utilizing Deloitte assets to secure companionship, romance and/or sex with her colleagues including Mr. Mire, violated "Communications Systems" and "Use of Deloitte Assets" under Deloitte's Code of Ethics & Professional Conduct.

72. Ms. Carberry's conduct is exceptionally egregious since she violated the same policies that she is responsible for enforcing as a Senior Manager with Deloitte Talent Leadership.

73. Ms. Carberry's own history of utilizing Deloitte assets to secure companionship, romance and/or sex with Deloitte colleagues and violating Deloitte's policies was the prime reason why she was angry when Mr. Keerikkattil raised similar allegations against Ms. Sawin in the form of a written complaint to her.

74. Ms. Carberry's saw an image of her past in Ms. Sawin and as a result was extremely biased in her favor when she should instead have been an unbiased investigator

of facts.

*Deloitte's Review of Ranjith Keerikkattil's Unlawful Termination*

75. On June 23, 2015, Mr. Keerikkattil sent a letter to Mike Preston, Deloitte's Chief Talent Officer requesting a review of Alicia Carberry's actions in Mr. Keerikkattill's case as well as investigate claims of sex based discrimination and retaliation committed by Ms. Carberry. The letter titled "Formal Request For Investigation" is attached as Exhibit M.

76. Pamela Wilcox Seats, a Senior Manager with Deloitte Talent, responded on behalf of Mr. Preston. Ms. Seat's response is attached as Exhibit N. The e-mail, in relevant part, states:

> Mike Preston has requested that Talent Relations leadership follow-up with you on his behalf to discuss your concerns in more detail. A member of our team will be reaching out to you directly early next week. We take concerns seriously and will thoroughly investigate this matter.

77. More than three weeks later on July 18, 2015, Benjamin Siegel responded to Mr. Keerikkattil on behalf of Deloitte Talent Leadership. Mr. Siegel's response is attached as Exhibit O. The e-mail, in relevant part, states:

> During Deloitte's subsequent investigation, you stated, among other things, that you had never been asked by that practitioner to limit your interactions to work related communications. You also stated that you had not contacted that junior practitioner following your May 31, 2015 email to her. Those statements were determined to be untrue. It has been determined that your failure to be truthful during the investigation was the most prominent factor in the decision to terminate your employment with Deloitte Consulting for cause, as it violated Deloitte Consulting's Code of Ethics and Professional Conduct.

78. Being outraged by Deloitte Talent Leadership's blatant errors, Mr. Keerikkattil responded back to Mr. Siegel. The response is attached as Exhibit P. The e-mail, in relevant part, states:

> [T]he statements made below in itself strengthens my case and proves that the whole review was a joke. According to you the Deloitte Talent Leadership stated "You also stated that you had not contacted that junior practitioner following your May 31, 2015 email to her". This is absolutely false. In my e-mail to Alicia Carberry on June 12, 2015, I had stated (Ex. A)

You did ask me whether there had been any communications between Stacy and me after the e-mail. I'm not sure if I had clarified this properly during our meeting yesterday. There was an event at the Smithsonian Zoo on IMPACT Day. Even though we saw each other, we did not talk to each other. She appeared angry towards me. I felt bad about it and thought that my e-mail with all the legal terms asking not to talk to me was the reason behind this. So I sent her a note telling her that I didn't have any hard feelings to her and that me not being involved directly with her for FPS would be the right thing to do.

Had Deloitte Leadership done the very basic amount of due diligence it wouldn't have stated such a blunder especially since I had included Ex. A in my letter to Mike Preston.

The same is the case with the other statement "that you had never been asked by that practitioner to limit your interactions to work related communications". I haven't been asked that question. I was asked if I had any intimate romantic and sexual relationship with Stacy Sawin and I replied no and I stand by it. Had Deloitte asked me the above I would have pointed to two events – AFBRG Ashey's War discussion and book signing event with Gayle Tzemach Lemmon on Wednesday, May 27, 2015, and ABRG Asian Pacific Heritage Month event on Thursday, May 28, 2015. These events that Ms. Sawin and I attended, were a couple of days before the cease and desist letter. During both the events Stacy Sawin did interact with me and she asked me – How was my Brazil vacation? Did you doing anything exciting in Rio? Are you doing anything exciting over the weekend? All of them were not "work related communications". Since Stacy Sawin had herself engaged in non-work related communications with me a handful of days before cease and desist letter, these claims hold no merit. Had Deloitte Leadership interviewed me, I would have provided them specific evidence, but it did not even after I specifically requested that I be interviewed.

In your letter you stated that according to Deloitte Talent Leadership an untrue statement is a violation of Deloitte's Code of Ethics and Professional Conduct.Pamela Wilcox Seats on Jun 24, 2015 stated that "A member of our team will be reaching out to you directly early next week" which turned out to be a lie. So using Deloitte Talent Leadership's own logic shouldn't Pamela Wilcox Seats also be terminated for cause?

All in all Deloitte Talent is a big joke and is completely incompetent. I have absolutely no confidence in Deloitte Talent Leadership. I know for sure that Stacy Sawin committed multiple violations that are graver than any that were alleged against me. And she deserves a minimum of termination for cause for her conduct based on the same rational for terminating me.

### *Deloitte's Continued Retaliation Through Eric Janson and Allison Baker Shealy*

79. Deloitte hires Seyfarth Shaw LLP to defend against Mr. Keerikkattil's anticipated Federal lawsuit. One of the Partners for Seyfarth Shaw LLP representing Deloitte was Eric J. Janson ("Mr. Janson"). Ms. Sawin discovers that Mr. Janson is also a Lehigh University ("Lehigh") Alumni like her and attempts to influence him[3]. As a

---

[3] Ms. Sawin graduated from Lehigh in 2015 while Mr. Janson graduated from Lehigh in 1998.

result, Mr. Janson develops a special interest in the Ms. Sawin beyond being Deloitte's attorney.

80. In order to retaliate against Mr. Keerikkattil for threatening to sue them, Ms. Sawin, Deloitte and its attorney Mr. Janson concocts a plan to accuse him of stalking Ms. Sawin. Together, they prepare a document titled "The interactions Between Stacy Sawin and Ranjith Keerikkattil" with multiple false statements about Mr. Keerikkattil and submits it to the District of Columbia Metropolitan Police Department ("MPD") First District with the intend of bringing criminal stalking charges against him. *See* Exhibit Q.

81. Ms. Sawin and Mr. Janson then file a frivolous Civil Restraining Order ("CRO") petition in D.C. Superior Court that gets summarily dismissed. *See* Exhibit R. In the CRO petition, they make a false and outrageous claim Mr. Keerikkattil assaulted and battered Ms. Sawin.

82. After failing the CRO petition, Ms. Sawin and Mr. Janson attempt a second bite at the apple by filing a Civil Protection Order ("CPO") petition in D.C. Superior Court. Mr. Janson recognizing his failure in obtaining a CRO contacts Meredith S. Campbell ("Ms. Campbell"), his intimate friend from Lehigh days[4] and currently works as a labor attorney with Shulman, Rogers, Gandal, Pordy and Ecker P.A. ("SRGPE"). *See* Exhibit S.

83. Mr. Janson also obtains funding for Ms. Campbell and SRGPE from Deloitte for representing Ms. Sawin in the CPO proceeding. For Mr. Janson, the CPO presented a golden opportunity to get closer again with his college sweetheart at Deloitte's expense.

---

[4] Mr. Janson and Ms. Campbell both graduated from Lehigh in 1998. After Lehigh, Ms. Campbell being brighter than Mr. Janson attended Harvard Law whereas Mr. Janson attended lower-tier George Mason Law.

Ms. Campbell ropes in Allison Baker Shealy ("Ms. Shealy"), an associate and colleague at SRGPE to assist her in the CPO petition. Hence, it was due to Mr. Janson's insistence that SRGPE was hired by Deloitte to represent Ms. Sawin even though it could have retained any major Am law 100 firm to represent her. Ms. Campbell practices labor law and Ms. Shealy practices securities law. Neither had any expertise litigating CPO proceedings in D.C. Superior Court.

84. On December 11, 2015, Ms. Shealy, representing Ms. Sawin and funded by Deloitte issued a subpoena duces tecum to Gore Brothers Reporting & Video Company, Inc ("Gore Brothers") for private deposition transcripts unrelated "to any incident or incidents of abuse alleged in the petition or answer, to medical treatment obtained as a result of those incidents, and to any prayers for relief" in violation of SCR-DV Rule 8 (a)(1). These private transcripts were housed inside Gore Brothers' office in Baltimore City. The subpoena was served on Gore Brothers by Shealy's Process Server in Baltimore City by personal hand-delivery to Mellissa McIe, Operations Supervisor, Gore Brothers, in her office at 20 S Charles St, Baltimore, MD, 21201.

85. Ms. Shealy violated Maryland Uniform Interstate Depositions and Discovery Act ("Maryland UIDDA") which would have required her to submit her Washington D.C. subpoena to the Clerk for the Circuit Court for Baltimore City in accordance with Md. Code, Courts and Judicial Proceedings, § 9-402. Ms. Shealy's subpoena misconduct resulted in Mr. Keerikkattil suing both her as well as Deloitte in Circuit Court for Baltimore City. Mr. Keerikkattil also filed Bar Counsel Complaints against Ms. Shealy and SRGPE. *See* Exhibit T.

*Damages Suffered by Ranjith Keerikkattil Due to Defendants' Unlawful Acts*

86. Mr. Keerikkattil was a Senior Consultant on the Partner/Principal/Director (PPD) Track with Deloitte Consulting LLP when his career with the firm was brought to an abrupt end due to unlawful acts committed by Defendants.

87. He was one of the youngest Senior Consultants at age 26 with target promotion date to Manager in 2017. At that career trajectory, he would have been promoted to a Partner well before the age of 40 with a career of over 20 years as a Partner with the firm.

88. A Deloitte Partner with 20+ years of experience would have earned a minimum of $20,000,000, if not a lot more in salary, deferred compensation and retirement benefits. As an example, Thomas P. Flanagan, a Senior Partner with Deloitte's Chicago office stated that his deferred compensation and retirement benefits alone at retirement were worth over $14 million[5].

89. This is in addition to the salary earned while being employed with Deloitte. Therefore, the $20,000,000 demanded by Mr. Keerikkattil is well justified if not much lower than his actual earning potential hadn't the Defendants interrupted his career through unlawful means.

90. Punitive damages of $30,000,000 demanded by Mr. Keerikkattil are justified as well. Deloitte is a serial discriminator and a habitual violator of Title VII claims. Even in the past five years, Deloitte has been sued at least three times for Title VII violations. In all these cases Deloitte settled the cases after failing summary judgment fearing a significant jury award.

---

[5] Mr. Flanagan made this disclosure in *U.S. v. Flanagan*, 12-cr-00510, U.S. District Court, Northern District of Illinois.

91. Deloitte had revenues of $14.9 billion and Deloitte Consulting had revenues of $7.1 billion in 2014. A significant punitive damage award is required to deter a serial discriminator like Deloitte.

92. In addition, Mr. Keerikkattil also lost his year-end bonus of up to $21,563 (18.75%) for FY 2014 that he would have been eligible for, due to Defendants' unlawful acts.

93. Besides, no amount of money would compensate for the severe emotional trauma Mr. Keerikkattil suffered when he was abruptly terminated on June 19, 2015, without prior notice or assistance from Deloitte.

94. This emotional trauma was a direct consequence of Defendants' actions, who acted intentionally or with reckless disregard for the consequences of their actions.

95. Mr. Keerikkattil also had to spend thousands of dollars in defending against Deloitte's attempts to bring criminal charges against him through MPD and U.S. Attorney's Office as defending the frivolous CPO case against him that Deloitte funded.

*EEOC Filing and Right to Sue*

96. A timely charge of employment discrimination on the basis of sex discrimination and retaliation was filed on with the Equal Employment Opportunity Commission ("EEOC").

97. EEOC issued a Right to Sue letter on April 6, 2016. A true and accurate copy of the letter is attached as Exhibit U.

## FIRST CAUSE OF ACTION
## SEXUAL DISCRIMINATION UNDER TITLE VII

**(DELOITTE LLP, DELOITTE CONSULTING LLP, DELOITTE SERVICES LP,**

## ALICIA CARBERRY, DERICK MASENGALE, MIKE PRESTON, PAMELA SEATS)

98. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

99. Plaintiff was terminated from his employment even though he was performing his job at a level that exceeded Deloitte's expectations

100. Deloitte Consulting did not terminate plaintiff as part of any legitimate workforce reduction since it published an open position with the same title and job description as Mr. Keerikkattil's on its Careers website within days of his unlawful termination. A copy of the career listing is attached as Exhibit V.

101. Deloitte Defendants' justifications for terminating Plaintiff's employment were pretexts to cover-up their underlying discriminatory actions.

102. Defendants kept on changing the reason for Plaintiff's termination from time to time. Defendants, to date, have failed to provide a consistent cause supported by evidence to justify Plaintiff's unlawful termination.

103. Deloitte Defendants turned a blind eye to Stacy Sawin's multiple violations of Deloitte's Code of Ethics & Professional Conduct that were much more egregious than any alleged against Mr. Keerikkattil. To date, no disciplinary actions were taken against Ms. Sawin by Deloitte.

104. Similarly situated Mr. Keerikkattil and Ms. Sawin were afforded disparate treatment by Deloitte because of the difference in sex.

105. Derick Masengale acted in concert with Ms. Carberry to discriminate Plaintiff, or in the alternative, was deliberately indifferent to Ms. Carberry's discrimination.

19

106. Defendants Deloitte LLP, Deloitte Consulting LLP, Deloitte Services LP, Mike Preston and Pamela Seats failed to exercise reasonable care to prevent, investigate and promptly correct the sexual discrimination committed by Alicia Carberry against Mr. Keerikkattil.

107. Plaintiff was terminated for Defendants' motive to discriminate against him due to his sex.

108. Defendants' sex discrimination against Plaintiff was willful.

109. Defendants have discriminated against Mr. Keerikkattil in the terms and conditions of his employment on the basis of his sex, in violation of Title VII of the Civil Rights Acts of 1964, as amended 42 U.S.C. 2000e et seq.

110. As a direct and proximate result of Defendants' unlawful and tortious acts, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

111. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes, will collectively exceed $30,000,000.

## SECOND CAUSE OF ACTION
## RETALIATION UNDER TITLE VII

### (DELOITTE LLP, DELOITTE CONSULTING LLP, DELOITTE SERVICES LP, ALICIA CARBERRY, DERICK MASENGALE, MIKE PRESTON, PAMELA SEATS, ERIC JANSON)

112. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

113. Mr. Keerikkattil filed a written complaint with Deloitte thru Alicia Carberry alleging multiple violations of Deloitte's Code of Ethics & Professional Conduct by Stacy Sawin.

114. Deloitte's policies encourage employees to report violations of Deloitte's Code of Ethics & Professional Conduct.

115. Mr. Keerikkattil's actions are protected under the anti-retaliatory provisions of 42 U.S.C. § 2000e-3(a) since he "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" alleging discrimination.[6]

116. Alicia Carberry was unhappy and angry about Mr. Keerikkattil's written complaint regarding Stacy Sawin's violations of Deloitte's Code of Ethics & Professional Conduct.

117. Ms. Carberry then acted to retaliate and punish Mr. Keerikkattil by unlawfully terminating his employment with Deloitte.

118. Derick Masengale acted in concert with Ms. Carberry to retaliate Plaintiff, or in the alternative, was deliberately indifferent to Ms. Carberry's retaliatory actions.

119. Defendants Deloitte LLP, Deloitte Consulting LLP, Deloitte Services LP, Mike Preston and Pamela Seats failed to exercise reasonable care to prevent, investigate and promptly correct the unlawful retaliation committed by Alicia Carberry against Mr.

---

[6] *See also EEOC Manual, Vol. 2, Sec. 8-II B.2*; *Matima v. Celli*, 228 F.3d 68, 78-79 (2d Cir. 2000) ("The law protects employees ... in the making of informal protests of discrimination, 'including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support of coworkers who have filed formal charges'"); *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

Keerikkattil.

120. Plaintiff was terminated for Defendants' motive to retaliate against him.

121. Defendants' retaliation against Plaintiff was willful.

122. Defendants have retaliated against Mr. Keerikkattil in the terms and conditions of his employment, in violation of Title VII of the Civil Rights Acts of 1964, as amended 42 U.S.C. 2000e et seq.

123. Defendants continued to retaliate against Plaintiff even after unlawfully terminating him by attempting to bring criminal charges against him through MPD and U.S. Attorney's Office as well as by filing frivolous CRO and CPO cases against him.

124. As a direct and proximate result of Defendants' unlawful and tortious acts, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

125. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes, will collectively exceed $30,000,000.

## THIRD CAUSE OF ACTION
## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

### (DELOITTE LLP, DELOITTE CONSULTING LLP, DELOITTE SERVICES LP, ALICIA CARBERRY, DERICK MASENGALE, MIKE PRESTON, PAMELA SEATS)

126. Plaintiff repeats, re-alleges, and incorporates by reference the above

paragraphs as though fully set forth herein.

127. Virginia recognizes wrongful discharge that violates public policy[7].

128. Defendants' discrimination based on sex violated Virginia's public policy[8].

129. Virginia law confers liability upon individual Defendants who directly participated in Plaintiff's wrongful termination[9].

130. Alicia Carberry and Derick Masengale planned, organized and participated in the "Termination Call" on June 19, 2015, where Plaintiff was wrongfully terminated.

131. Mr. Masengale acted in concert with Ms. Carberry to discriminate Plaintiff, or in the alternative, was deliberately indifferent to Ms. Carberry's discrimination.

132. Defendants Deloitte LLP, Deloitte Consulting LLP, Deloitte Services LP, Mike Preston and Pamela Seats failed to exercise reasonable care to prevent, investigate and promptly correct the sexual discrimination committed by Alicia Carberry against Mr. Keerikkattil.

133. Plaintiff was terminated for Defendants' motive to discriminate against him due to his sex.

134. Defendants' sex discrimination against Plaintiff was willful.

---

[7] The Supreme Court of Virginia has recognized three situations in which a litigant may show her discharge violated public policy: (1) where an employer fired an employee for exercising a statutorily created right; (2) when thepublic policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) "where the discharge was based on the employee's refusal to engage in a criminal act." *Rowan v. Tractor Supply Co.*, 263 Va. 209, 559 S.E.2d 709, 711 (Va. 2002).

[8] Virginia law does not allow and, therefore, prohibits, discrimination on the basis of sex. *Walker v. Electrolux Corp.*, 55 F. Supp. 2d 501 (W.D. Va. 1999). Plaintiff's factual allegations, if proven true, would support a reasonable inference by the fact finder that employer terminated her solely because of her status as a woman who was also a working mother; this basis for termination would be a classic example of gender discrimination which is repugnant to Virginia's strong public policy. *Bailey v. Scott-Gallaher, Inc.*, 253 Va. 121, 480 S.E.2d 502, 1997 Va. LEXIS 20 (1997).

[9] *Van Buren v. Grubb*, 284 Va. 584 (Va. 2012) (concluding that "that Virginia recognizes a common law tort claim of wrongful discharge in violation of established public policy against an individual who was not the plaintiff's actual employer but who was the actor in violation of public policy and who participated in the wrongful firing of the plaintiff, such as a supervisor or manager").

135. As a direct and proximate result of Defendants' unlawful and tortious acts, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

136. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes, will collectively exceed $30,000,000.

## FOURTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

### (ALICIA CARBERRY, STACY SAWIN)

137. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

138. Defendants were aware of the contractual employment relationship between Mr. Keerikkattil and Deloitte Consulting LLP.

139. Defendants through their "improper methods" [10] induced or caused the termination of the contractual relationship between Mr. Keerikkattil and Deloitte Consulting LLP.

140. As a direct and proximate result of Defendants' "improper methods",

---

[10] "Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Duggin v. Adams*, 234 Va. 221, 227 (1987). Improper methods include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559 (2011) (internal quotation marks omitted).

Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

141. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $30,000,000.

## FIFTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (ALICIA CARBERRY, STACY SAWIN)

142. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

143. Defendants were aware of the prospective economic advantage for Mr. Keerikkattil through his employment with Deloitte Consulting LLP.

144. Defendants through their "improper methods" induced or caused the termination of the economic relationship between Mr. Keerikkattil and Deloitte Consulting LLP.

145. Absent Defendants' "improper methods", the economic relationship between Mr. Keerikkattil and Deloitte Consulting LLP would have continued resulting in economic advantage for the Plaintiff.

146. As a direct and proximate result of Defendants' "improper methods",

Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

147. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $30,000,000.

## SIXTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL

### (DELOITTE LLP, DELOITTE SERVICES LP, MIKE PRESTON, PAMELA SEATS)

148. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

149. Mr. Keerikkattil sent Mike Preston, Chief Talent Officer for Deloitte, a written complaint regarding sex discrimination and retaliation perpetrated by Alicia Carberry.

150. Mr. Preston promised a thorough and independent investigation into the complaint made by Mr. Keerikkattil

151. Pamela Seats, acting on behalf of Mike Preston stated that Deloitte Talent Leadership "will thoroughly investigate this matter" and that "a member of our team will be reaching out to you directly early next week" in the response to Mr. Keerikkattil's letter.

26

152. No one from Deloitte Talent Leadership ever contacted Mr. Keerikkattil as promised by Ms. Seats.

153. Neither did Deloitte Talent Leadership conduct a thorough investigation into Mr. Keerikkattil's complaint and instead came up with a fictitious reasons to justify Ms. Carberry's unlawful acts, which has since been discredited based on factual evidence. See

154. Plaintiff relied to his detriment on these express and implied promises and representations made by the Defendants.

155. Injustice can only be avoided by enforcement of the Defendants' promises and representations.

156. As a direct and proximate result of Defendants' failure to honor its promises and representations, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

157. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and believes, will collectively exceed $30,000,000.


### SEVENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**(ALICIA CARBERRY, STACY SAWIN, ANDREW SAWIN)**

158. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

159. Defendants were directly responsible for the unjust and tortious termination of Plaintiff's employment with Deloitte Consulting LLP, and therefore they are liable for emotional distress damages absent physical injury under Virginia Law[11].

160. Defendants' conduct was extreme and outrageous; done willfully and intentionally without regard to the consequences for Plaintiff; and was part of an effort to jeopardize his employment with Deloitte Consulting LLP.

161. Defendants' conduct actually and proximately caused Plaintiff mental anguish, severe emotional distress, and serious mental injury, as well as other substantial injury, damage, and loss. Plaintiff has suffered and continues to suffer frequent headaches, mood swings, depression, weight gain, sleep deprivation and excessive reliance on alcohol.

162. As a direct and proximate result of Defendants' unlawful and tortious acts, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

163. Each of Defendants' acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendants in amounts according to proof at trial, which Plaintiff is informed and

---

[11] The Supreme Court of Virginia has ruled that loss of a job in an unjust and tortious fashion could foreseeably cause distress and harm to feelings in the same manner as previous Virginia cases allowing recovery for emotional damages absent physical injury. *Sea-Land. Serv. Inc. v. O'Neal*, 297 S.E.2d 647, 653 (Va. 1982).

believes will collectively exceed $30,000,000.

## EIGTH CAUSE OF ACTION
## DEFAMATION

### (STACY SAWIN)

164. Plaintiff repeats, re-alleges, and incorporates by reference the above paragraphs as though fully set forth herein.

165. Beginning around June 2015 and continuing until October 2015, Defendant Sawin made a number of statements containing falsehoods, exaggerations, and/or inaccuracies about Plaintiff including that he brought her on to the FPS engagement to have a romantic relationship with her. The complete list of falsehoods, exaggerations, and/or inaccuracies is included in the document titled "The interactions Between Stacy Sawin and Ranjith Keerikkattil" attached as Exhibit Q. These false statements portray Mr. Keerikkattil as someone who used his official position to secure companionship and sex.

166. Defendant Sawin's statements about Mr. Keerikkattil are defamatory *per se* since they impute unfitness to perform the duties of an office or employment, or want of integrity in the discharge of such duties[12].

167. Defendant Sawin's statements about Mr. Keerikkattil are defamatory *per se* since they prejudice Mr. Keerikkattil in his profession or trade[13].

168. Defendant Sawin made these statements either with knowledge that they

---

[12] A statement is defamatory *per se* if it (1) imputes the commission of a criminal offense involving moral turpitude for which a party may be convicted; (2) imputes that the person is infected with a contagious disease which would exclude the party from society; (3) imputes an unfitness to perform the duties of a job or a lack of integrity in the performance of the duties; or (4) prejudices the party in her profession or trade. *Fleming v. Moore*, 221 Va. 884, 889 (1981).
[13] *Id.*

29

were false and defamatory of Plaintiff and/or, if the false and defamatory nature of these statements was not known to her, with reckless disregard for their obvious falsity and defamatory nature.

169. As a direct and proximate result of the above-described defamatory statements, Plaintiff has suffered and will continue to suffer substantial injury, damage, and loss, including, but not limited to loss of his personal and professional reputation, shame, mortification, and emotional distress all to his general damage, which Plaintiff is informed and believes will exceed $20,000,000, plus interest accrued and growing.

170. Each of Defendant Sawin's acts as described above were willful, oppressive, and malicious, thereby entitling Plaintiff to recover exemplary and punitive damages against Defendant Sawin in amounts according to proof at trial, which Plaintiff is informed and believes will collectively exceed $30,000,000.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff RANJITH KEERIKKATTIL prays for judgment against Defendants STACY SAWIN, ANDREW SAWIN, DELOITTE LLP, DELOITTE CONSULTING LLP, DELOITTE SERVICES LP, ALICIA CARBERRY, DERICK MASENGALE, MIKE PRESTON, PAMELA SEATS and ERIC JANSON as follows:

1. For reinstatement, back pay, front pay, general and compensatory damages, including prejudgment interest, in accordance with proof at the time of trial, in the minimum amount of $20,000,000;

2. For punitive damages, where permitted, to be determined at trial, in the minimum amount of $30,000,000;

3. Injunctive and declaratory relief pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000e, et seq., 28 U.S.C. §§ 2201 and 2202.

4. For Plaintiff's costs and attorneys' fees; and

5. For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims.

Dated: June 29, 2016                          Respectfully submitted,

Ranjith Keerikkattil
4707 Grand Bend Drive
Catonsville, MD 21228
Tel: (443) 690-1031
E-mail: rkeerikkattil@gmail.com

*Plaintiff*